No. 08-2378

# United States Court of Appeals

*for the*

# Fourth Circuit

MARTHA WARD, on behalf of herself and all others similarly situated,

*Plaintiff – Appellee*

*v.*

DIXIE NATIONAL LIFE INSURANCE COMPANY and
NATIONAL FOUNDATION LIFE INSURANCE COMPANY,

*Defendants – Appellants*

*On Appeal from the Unites States District Court for the District of South Carolina
in Case No. 3:03-cv-03239-JFA (Hon. Joseph F. Anderson, Jr.)*

## BRIEF FOR DEFENDANTS-APPELLANTS

SUSAN E. ENGEL
ELIZABETH M. LOCKE
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC 20005
(202) 879-5000

J. CALHOUN WATSON, JR.
SOWELL GRAY STEPP
   & LAFFITTE, LLC
1310 Gadsden Street
Columbia, SC 29211-1550
(803) 929-1400

KENNETH W. STARR
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA 90017
(213) 680-8400

C. ALLEN FOSTER
KEVIN E. STERN
ROBERT P. CHARROW
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3100

*Attorneys for Defendants-Appellants*

MARCH 2, 2009



## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. __08-2378__    Caption: ____Ward v. Dixie National Life Insurance Co., et al.____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Dixie Nat. Life Ins. Co.__ who is ____Appellant____,
(name of party/amicus)    (appellant/appellee/amicus)

makes the following disclosure:

1.    Is party/amicus a publicly held corporation or other publicly held entity?
☐ YES    ☑ NO

2.    Does party/amicus have any parent corporations?
☑ YES    ☐ NO
If yes, identify all parent corporations, including grandparent and great-grandparent corporations:  Heartland Holding Company, Inc. (parent)

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
☐ YES    ☑ NO
If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
☐ YES    ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)
☐ YES    ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?
☐ YES    ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

_____ s/ Kevin E. Stern _____          _____ 03/02/2009 _____
(signature)                                     (date)

i

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. 08-2378            Caption:            Ward v. Dixie National Life Insurance Co., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Nat. Found. Life Ins. Co.__ who is _____Appellant_____,
  (name of party/amicus)              (appellant/appellee/amicus)

makes the following disclosure:

1.    Is party/amicus a publicly held corporation or other publicly held entity?
        ☐ YES                    ☑ NO

2.    Does party/amicus have any parent corporations?
        ☑ YES                    ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations: USHEALTH Group, Inc. (parent); Special Situations Holdings, Inc. (grandparent); Credit Suisse First Boston, LLC (great-grandparent).

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
        ☐ YES                    ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
        ☐ YES                    ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)
        ☐ YES                    ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?
        ☐ YES                    ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:


_____s/ Kevin E. Stern_____              _____03/02/2009_____
        (signature)                                          (date)

# TABLE OF CONTENTS

*Page*

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER
INTERESTS FOR DIXIE NATIONAL LIFE INSURANCE
COMPANY ................................................................................ i

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER
INTERESTS FOR NATIONAL FOUNDATION LIFE INSURANCE
COMPANY ................................................................................ ii

TABLE OF AUTHORITIES ....................................................... x

INTRODUCTION ...................................................................... 1

JURISDICTIONAL STATEMENT ............................................ 5

ISSUES PRESENTED FOR REVIEW ...................................... 6

STATEMENT OF THE CASE .................................................... 7

STATEMENT OF FACTS .......................................................... 10

    A.   The Insurance Policy and Plaintiff's Complaint ................ 10

    B.   Initial District Court And Appellate Proceedings .............. 14

    C.   Section 38-71-242 And Proceedings On Remand .............. 16

SUMMARY OF ARGUMENT ................................................... 19

STANDARD OF REVIEW ........................................................ 21

ARGUMENT .............................................................................. 21

    I.   SECTION 38-71-242 BARS ALL CLAIMS IN THIS
       CASE.................................................................................. 21

       A.   The Legislature Prescribed The Reach Of Section 38-71-
          242. .......................................................................... 23

       B.   Section 38-71-242 Has No Retroactive Effect ............... 26

C.  Section 38-71-242 Advances Legitimate Public
Purposes. ...................................................................30

II.   THE DISTRICT COURT ABUSED ITS DISCRETION IN
CERTIFYING AND REFUSING TO DECERTIFY THIS
CLASS ACTION. ...............................................................32

A.  Individual Issues Of Fact Predominate Over Common
Questions.....................................................................33

B.  Ward's Interests Are Adverse To The Interests Of Many
Class Members. ..........................................................36

III.  THE DISTRICT COURT ERRED IN GRANTING
SUMMARY JUDGMENT TO WARD AND THE CLASS..................39

A.  Ward And The Class Failed To Demonstrate That They
Were Actually Billed Amounts Greater Than The
Amounts Their Providers Accepted As Payment In Full. ................40

B.  The District Court Erred In Granting Summary
Judgment For Class Members Who Are Medicare
Beneficiaries.................................................................43

C.  The District Court Erred In Granting Summary
Judgment On Damages Based On Double Hearsay........................48

D.  The District Court Erred In Failing To Offset Damages
By The Higher Premiums Ward And Class Members
Would have Paid In The Non-Breach World. ...............................53

CONCLUSION .....................................................................58

CERTIFICATE OF COMPLIANCE...................................................60

CERTIFICATE OF SERVICE........................................................61

# TABLE OF AUTHORITIES

*Page(s)*

**Cases:**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ...................................................................37

*American Capital Corp. v. Federal Deposit Ins. Corp.,*
472 F.3d 859 (Fed. Cir. 2006)....................................................55

*American Nat'l Fire Ins. Co. v. Smith Grading & Paving, Inc.,*
454 S.E.2d 897 (S.C. 1994) ...................................................26, 27

*American Steel Foundries v. Tri-City Cent. Trades Council,*
257 U.S. 184 (1921) ....................................................................29

*Blades v. Monsanto Co.,*
400 F.3d 562 (8th Cir. 2005) ......................................................35

*Bluebonnet Sav. Bank, F.S.B. v. United States,*
339 F.3d 1341 (Fed. Cir. 2003)...............................................55, 56

*Broussard v. Meineke Disc. Muffler Shops, Inc.,*
155 F.3d 331 (4th Cir. 1998) ............................................37, 38, 39

*Certain Underwriters at Lloyd's, London v. Sinkovich,*
232 F.3d 200 (4th Cir. 2000) ......................................................52

*Connolly v. Pension Benefit Guar. Corp.,*
475 U.S. 211 (1986) ....................................................................31

*Deiter v. Microsoft Corp.,*
436 F.3d 461 (4th Cir. 2006) ..................................................21, 33

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.,*
438 U.S. 59 (1978) ......................................................................28

*Dunton v. S.C. Bd. of Exam'rs in Optometry,*
353 S.E.2d 132 (S.C. 1987) .........................................................25

*East Texas Motor Freight Sys. Inc. v. Rodriguez,*
431 U.S. 395 (1977) ...................................................................37

*Fernandez-Vargas v. Gonzales,*
548 U.S. 30 (2006) ......................................................23, 26, 28

*Hammond v. United States,*
786 F.2d 8 (1st Cir. 1986).......................................................29

*Hansberry v. Lee,*
311 U.S. 32 (1940) ...................................................................37

*In re GMC Pick-Up Truck Fuel Tank Litig.,*
55 F.3d 768 (3d Cir. 1995) ......................................................37

*In re Wildewood Litig.,*
52 F.3d 499 (4th Cir. 1995) .....................................................21

*Invention Submission Corp. v. Dudas,*
413 F.3d 411 (4th Cir. 2005) .................................................3, 22

*Jenkins v. Meares,*
394 S.E.2d 317 (S.C. 1990) ....................................................23

*JKC Holding Co. v. Washington Sports Ventures, Inc.,*
264 F.3d 459 (4th Cir. 2001) ...................................................21

*Ken Moorhead Oil Co., Inc. v. Federated Mut. Ins. Co.,*
476 S.E.2d 481 (S.C. 1996) .....................................................31

*Kidwell v. Transp. Commc'ns Int'l Union,*
946 F.2d 283 (4th Cir. 1991) ...................................................37

*Landgraf v. USI Film Prods.,*
511 U.S. 244 (1994) ........................................22, 23, 24, 26, 27, 29

*M.J.T. v. State of Fla.,*
927 So. 2d 1077 (Fla. Dist. Ct. App. 2006).........................51

*Martin v. Stewart,*
499 F.3d 360 (4th Cir. 2007) ...................................................21

vi

*New York Cent. R.R. Co. v. White,*
   243 U.S. 188 (1917) ...................................................................28

*Pacific Gas & Elec. Co. v. United States,*
   73 Fed. Cl. 333 (2006)............................................................56

*Pipes v. Life Investors Ins. Co. of America,*
   No. 1:07CV00035, 2008 WL 5328201 (E.D. Ark. Nov. 21, 2008) .............35, 36

*Plaut v. Spendthrift Farm, Inc.,*
   514 U.S. 211 (1995) ...................................................................29

*Rowland v. American Gen. Fin., Inc.,*
   340 F.3d 187 (4th Cir. 2003) .................................................52

*Schlesinger v. Reservists Comm. to Stop the War,*
   418 U.S. 208 (1974) ...................................................................37

*Shadburne-Vinton v. Dalkon Shield Claimants Trust,*
   60 F.3d 1071 (4th Cir. 1995) .................................................30

*Sloan v. South Carolina Bd. of Physical Therapists,*
   370 S.C. 452 (2006)..................................................................26

*Southern Nuclear Operating Co. v. United States,*
   77 Fed. Cl. 396 (2007)............................................................55

*Thorn v. Jefferson-Pilot Life Ins. Co.,*
   445 F.3d 311 (4th Cir. 2006) .................................................35

*United States v. Clark,*
   No. 98-4142, 1999 WL 22753 (4th Cir. Jan. 21, 1999)....................................50

*United States v. Gonzales,*
   520 U.S. 1 (1997) ...............................................................23, 25

*United States v. Hussein,*
   151 F. App'x 257 (4th Cir. 2005) .................................................51

*United States v. Jackson,*
   480 F.3d 1014 (9th Cir. 2007)..................................................23

*United States v. McIntyre,*
  997 F.2d 687 (10th Cir. 1993) ........................................................51

*United States v. Srivastava,*
  540 F.3d 277 (4th Cir. 2008) ........................................................33

*United States v. Vidacak,*
  553 F.3d 344 (4th Cir. 2009) ........................................................21

*Ward v. Dixie Nat'l Life Ins. Co.,*
  257 F. App'x 620 (4th Cir. 2007) ............................................. 1, 2, 3, 4, 6, 8, 9,
                                                                       15, 18, 19, 20, 21, 22, 25,
                                                                       32, 33, 35, 39, 40, 41, 43

*Ward v. Dixie Nat'l Life Ins. Co.,*
  No. 06-2022, 2007 WL 2914954 (4th Cir. Oct. 5, 2007)..................15

*White v. J.M. Brown Amusement Co., Inc.,*
  601 S.E.2d 342 (S.C. 2004) ........................................................46

*Women's Equity Action League v. Cavazos,*
  906 F.2d 742 (D.C. Cir. 1990) ...................................................3, 22

*Zeran v. America Online, Inc.,*
  129 F.3d 327 (4th Cir. 1997) ........................................................29

*Zinkand v. Brown,*
  478 F.3d 634 (4th Cir. 2007) ........................................................42

**Statutes and Rules:**

15 U.S.C. § 1012.............................................................................31

18 U.S.C. § 1001.............................................................................46

28 U.S.C. § 1291............................................................................. 5

28 U.S.C. § 1332............................................................................. 5

42 C.F.R. § 414.21 ................................................................44

42 U.S.C. § 1320a-7a(a)(2) ....................................................44

42 U.S.C. § 1320a-7b(e) ........................................................44

42 U.S.C. § 1395b-7 ..............................................................47

42 U.S.C. § 1395w-4(a)(1) .....................................................44

42 U.S.C. § 1395w-4(g)(1)(A)(i) .............................................44

42 U.S.C. § 1395l(a) ..............................................................44

Fed. R. Civ. P. 23 .............................................................32, 36

Fed. R. Civ. P. 54 ....................................................................5

Fed. R. Evid. 803 ............................................................50, 52

Fed. R. Evid. 803(6) ........................................................50, 52

S.C. Code Ann. § 38-3-110 ...............................................12, 25

S.C. Code Ann. § 38-61-20 ...............................................25, 28

S.C. Code Ann. § 38-71-242 ........................... 2, 3, 6, 16, 17,
19, 21, 22, 23, 24,
25, 26, 27, 29, 30

**Other Authorities:**

11-55 *Corbin on Contracts* § 55.3 .................................56, 57

CMS Carrier Manual § 10.3.10.2 (CMS Pub. 100-04) (Oct. 1, 2003),
http://www.cms.hhs.gov/manuals/ ....................................47

Lee Hyde, The *McGraw-Hill Essential Dictionary of Health Care* 133
(1988) .............................................................................34

MEDICARE & YOU 2009,
   http://www.medicare.gov/Publications/Pubs/pdf/10050.pdf ............................47

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 277 (2d ed. 2000)............................56

RESTATEMENT (SECOND) CONTRACTS § 347 .............................................................55

# INTRODUCTION

This case arises from a dispute over the meaning of the term "actual charges" in specified disease insurance policies issued in the State of South Carolina. In a prior appeal, this Court held that the term was ambiguous. *Ward v. Dixie Nat'l Life Ins. Co.*, 257 F. App'x 620, 624-27 (4th Cir. 2007) ("*Ward I*"), reprinted at A604-12. While the South Carolina Department of Insurance ("Department") interpreted the term to mean "the amount that [an insured is] legally obligated to pay for a specific service," A457 (emphasis omitted), plaintiff Martha Ward argued that the term means any amount demanded "on the bill sent to the patient," A608; *see also* A155. This Court found "nothing to indicate" which of these two reasonable interpretations of the term applied: "the amount actually billed," which Ward claimed were listed on bills she received, "or the amount actually owed," which for Ward were listed on the Explanation of Benefits ("EOB") forms she received from her primary health insurer. A608. Because state common law required that an ambiguous term in an insurance policy be construed in favor of an insured's reasonable interpretation, this Court held that "actual charges" meant the former — the "amount actually billed" — and ordered "that the district court enter summary judgment for Ward on her breach of contract claim." A609-10.

1

This appeal arises against a starkly different legal backdrop. Following this Court's decision in *Ward I*, the South Carolina legislature enacted into law a definition of "actual charges," as that term is used in all specified disease insurance policies issued in South Carolina that do not otherwise define the term. This statute, S.C. Code Ann. § 38-71-242, in effect, provides the "indicat[ion]" of meaning that this Court found missing in *Ward I*. Section 38-71-242 prohibits insurers from paying any claim that is outstanding as of June 4, 2008, where that claim is based upon "actual charges" that are greater than the amount legally owed to a health care provider. The term "actual charges" is, therefore, no longer ambiguous: section 38-71-242 now provides a default definition and renders the common law rule of construction this Court applied in *Ward I* inapplicable to the meaning of the term. Because the claims in this case were outstanding as of June 4, 2008, section 38-71-242 prohibits Defendants National Foundation Life Insurance Company ("NFL") and Dixie National Life Insurance Company ("Dixie") from paying the claims at issue based on Ward's definition of actual charges.

On remand from this Court, however, the district court refused to apply section 38-71-242. The district court believed that it had no authority to apply the statutory definition of "actual charges" because it conflicted with this Court's decision in *Ward I*. A772. But it is well established that the "mandate rule" has no

application where "controlling legal authority has changed dramatically." *Invention Submission Corp. v. Dudas*, 413 F.3d 411, 415 (4th Cir. 2005); *see also Women's Equity Action League v. Cavazo*s, 906 F.2d 742, 751 n.14 (D.C. Cir. 1990). And, contrary to the district court's conclusion, section 38-71-242 clearly applies to the unpaid claims pending in this case. The statute imposes a prospective legal obligation on insurers with respect to those outstanding claims: "after the effective date of this section [June 4, 2008], an insurer … shall not pay any claim or benefits based upon an actual charge … in an amount in excess of the 'actual charge' … as defined in this section." Thus, contrary to the common law rule of construction that this Court applied in *Ward I*, the statute codifies the Department's "longstanding interpretation" of the term "actual charges" (rather than the insured's interpretation) as the default definition whenever that term is left undefined in a specified disease insurance policy. A1251. The district court therefore erred in denying defendants' motion for judgment on the pleadings and in granting summary judgment in favor of Ward and the class.

Making matters worse, although the district court announced its intent not to deviate from this Court's decision in *Ward I*, it did precisely that in allowing Ward and the class to prove their damages without demonstrating that they had received bills from their providers demanding payment of amounts greater than the amounts their providers had agreed to accept as payment in full for their services. But

3

absent proof of an "amount actually billed" that is higher than the amount actually owed to the provider, there can be no damages. Indeed, it is hard to see how an insured could even advance a reasonable interpretation of "actual charges" as the amount "actually billed," if the insured never received a provider bill for an amount greater than the amount actually owed per the EOB. Additionally, as to those class members who are Medicare beneficiaries, they could not have been billed an amount greater than what their providers accepted as payment in full as a matter of law, because federal law prohibits providers from billing Medicare beneficiaries more than what Medicare pays for their services. The district court thus erred in granting summary judgment without requiring that Ward and the class members submit evidence demonstrating that they were in fact billed a higher amount of alleged "actual charges."

Further departing from *Ward I*, which had expressly observed that the district court would be free to consider defendants' motion to decertify the class, the district court gave defendants' motion short shrift, allowing a class that was rife with conflicts and that should have been, under *Ward I*, overwhelmed with individual billing issues, to proceed to final judgment.

Finally, the district court's rulings are rife with evidentiary errors, including accepting double hearsay records as proof of damages; refusing to follow black letter law requiring that damages be offset in order to avoid putting plaintiffs in a

better position than they would have been absent a breach; and incorrectly resolving other disputed issues of fact in favor of plaintiffs.

Defendants respectfully submit that judgment should be entered on the pleadings for defendants, or in the alternative, the district court's summary judgment ruling should be reversed.

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeded $75,000 at the time of removal; plaintiff, Martha Ward, is domiciled in South Carolina; and defendants, NFL and Dixie, are neither incorporated under the laws of, nor have their principal places of business in, South Carolina.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, in that this is an appeal from an order granting final judgment disposing of all parties' claims pursuant to Fed. R. Civ. P. 54.  The district court entered final judgment on December 15, 2008.  A1831.  Defendants timely filed a notice of appeal on December 17, 2008.  A1833-34.

## ISSUES PRESENTED FOR REVIEW

1.     Whether the district court erred in refusing to apply South Carolina Code Ann. § 38-71-242, which, as interpreted and applied by the South Carolina Department of Insurance, bars payment of the claims at issue in this action, because the payments would be in excess of the statutory definition of "actual charges," and the claims were outstanding as of the statute's effective date, June 4, 2008.

2.     Whether the district court erred in certifying a class action where (i) Ward's interests are antagonistic to the interests of the class, and (ii) common questions of fact do not predominate over individual questions.

3.     Whether the district court erred in holding that this Court's prior ruling in *Ward I* did not require class members to demonstrate that their health care providers actually billed them amounts greater than the amounts actually owed.

4.     Whether the district court erred in awarding damages to those class members who are Medicare beneficiaries when it violates federal law for a health care provider to bill a Medicare beneficiary an amount greater than the Medicare-approved amount, and when there was no evidence that any such provider violated federal law.

5.     Whether the district court erred in admitting disputed hearsay and double-hearsay records to establish, as a matter of law, that Ward and class members were entitled to damages and the amount thereof.

6.     Whether the district court erred in failing to apply black letter law providing that defendants were entitled to an offset of damages.

## STATEMENT OF THE CASE

This case challenges the State of South Carolina's interpretation of the term "actual charges" as used in certain specified disease insurance policies sold in South Carolina.  Plaintiff, Martha Ward, brought an action in state court against defendants, alleging, *inter alia*, a breach of contract claim based on NFL's alleged failure to pay the "actual charges" benefits under her Dixie cancer treatment benefit policy (the "Policy").  R1.  After defendants removed the action, R1, Ward twice amended her complaint and sought certification of a nationwide class of "[a]ll persons who purchased cancer policies" from Dixie and had been paid claims based on the amount their health care providers had negotiated with their primary health care insurers.  R98, 111.

The district court certified a statewide class on the breach of contract claim, A136-47, and then granted defendants summary judgment on the same claim. A536-46.  The court held that the term "actual charges" means "the charges for which the patient is liable when medical services are rendered, not the fictional

amounts indicated on the invoice that the provider does not expect the patient to pay." A544-45. On appeal, in *Ward I*, this Court affirmed the district court's decision to limit class membership to South Carolina residents, but declined to address the propriety of class certification, noting that the district court "will be able to consider the motion to decertify." A612. On the merits, this Court reversed, holding that the term "actual charges" was patently ambiguous and, therefore, South Carolina common law rules of insurance policy construction required the Court to construe the term in favor of Ward's reasonable interpretation as the amount on the bill she received from her provider. A607-09. The Court ordered summary judgment for Ward on her breach of contract claim and remanded for further proceedings. A609.

On remand, defendants filed a motion to decertify the class, which the district court denied. R319. Defendants also filed a motion for judgment on the pleadings, on the ground that the South Carolina legislature, in response to this Court's holding in *Ward I*, had enacted a statute that defined the term "actual charges" in specified disease insurance policies and that prohibited insurers from paying claims based on any definition of actual charges in excess of the statutory definition. A760-65. The district court denied defendants' motion. A766-73.

The district court subsequently granted summary judgment for Ward and the class on the breach of contract claim, and denied defendants' cross-motion for

summary judgment on the claims brought by Medicare beneficiaries.  A1458-70. The district court held that:  (i) *Ward I* required it to enter summary judgment for Ward and the class; (ii) *Ward I* did not require Ward or the class to prove that their providers had billed them amounts greater than what the providers agreed to accept as payment in full for their services; (iii) *Ward I* did not require the entry of judgment for defendants on the claims brought by class members whose primary health insurance was Medicare; (iv) damages need not be offset by the higher premiums class members would have paid NFL if they had received benefits based on Ward's interpretation of "actual charges"; and (v) Ward and the class could prove damages based upon spreadsheets of claim information that NFL obtained from EOB statements provided by class members and produced in this litigation. *Id.*

The district court held an evidentiary hearing on damages, A1767-1818; R393, and, over defendants' objections that they were entitled to a trial by jury on disputed issues of fact, issued an Order on Damages on December 12, 2008. A1819-24; R396.  On December 15, 2008, the district court entered judgment for Ward and the class in the amount of $7,828,071.39, which includes pre-judgment interest.  A1825-32; R403; R404.  Defendants' appeal followed.

## STATEMENT OF FACTS

### A.    The Insurance Policy and Plaintiff's Complaint

This case involves a dispute over the meaning of the term "actual charges" in certain specified disease insurance policies.  Dixie underwrote and issued these policies to residents of South Carolina (Forms CP-1001, CP-1001A, CP-1003, CP-1004 and CP-1005), after the South Carolina Department of Insurance reviewed and approved the language of each policy form.  A605.  The Policy is a supplemental benefits insurance policy, which "provides identified benefits in the event an insured suffers a covered loss because of cancer."  A606.  Benefits are payable upon receipt of proper written proof of loss submitted by an insured.  *See id*.  Certain benefits, *e.g.*, for surgery, drugs and medicine, and prosthetics, are capped at specified amounts or percentages, while others, including radiation and chemotherapy, are paid according to the "actual charges" incurred for such treatments, with "No Lifetime Maximum Benefit."  *Id*.  The Policy provides that premiums may be adjusted annually to take into account claim payouts from the prior year.  A178; A1291.  The Policy does not define "actual charges."  A606.  In 1994, NFL assumptively reinsured all South Carolina cancer policies issued by Dixie under five of its cancer policy forms, including Ward's Policy.  A64-115.

Plaintiff Martha Ward purchased the Policy in August 1990.  A606.  Her Policy listed Ward's husband as an additional insured.  *Id*.  In 2001, Ward's

husband was diagnosed with prostate cancer and received radiation therapy. *Id.* His claims were covered under his primary health insurance policy, namely, a preferred provider organization ("PPO") major medical insurance policy administered by Blue Cross and Blue Shield of South Carolina ("BCBS"). *Id.* Under the terms of that PPO policy, network health care providers agreed, in advance of rendering services to insureds, to charge and accept as payment in full pre-negotiated contract amounts; providers also agreed not to "balance bill," *i.e.*, attempt to collect from insureds any amount in excess of the pre-negotiated amounts. *Id.* Pursuant to the terms of the BCBS policy, BCBS paid each provider's pre-negotiated charges for the cancer treatment and services provided to Ward's husband. *Id.*

In 2002, Ward submitted claims to NFL, seeking payment for the "actual charges" of her husband's radiation treatment, but failed to submit the BCBS EOBs showing the provider's pre-negotiated amounts actually owed. *Id.* Instead, Ward submitted statements purporting to show the provider's non-discounted charges. A450. NFL requested that Ward submit copies of the EOBs, A444-45, explaining that the Policy only entitled Ward to payment of the amount each provider actually charged pursuant to the BCBS PPO agreement. A606. Ward refused. A606-07; *see also* A447. She claimed that the Policy entitled her to payment of the amounts listed on the "non-discounted bill[s]" she received from

11

providers, regardless of whether those amounts were fictitious (*i.e.*, not the actual amount charged for services), and regardless of whether the BCBS PPO agreement *prohibited* the providers from actually charging those amounts. A606-07.[1] Because Ward refused to submit copies of the EOBs or any other proof of loss, NFL did not further process her claims at that time. *Id.*[2]

On August 14, 2002, Ward lodged a complaint with the Department of Insurance, A450-51, which is charged with regulating and interpreting all insurance policies sold in the State of South Carolina, *see* S.C. Code Ann. § 38-3-110. The Department rejected Ward's complaint, explaining that "[c]harges by providers that are discounted due to other contracts become the actual charges, as the discounted amount cannot be balanced billed to either the insurance company or the patient." A453.

Ward thereafter submitted a second complaint to the Department, requesting a "legal definition" of "actual charges." A455. The Department explained that NFL had correctly construed "actual charges" in the Policy: "[t]he term 'actual

---

[1]    NFL contends that the Policy entitles Ward to payment of the amount the provider actually charged pursuant to the PPO agreement, regardless of the amount of any payments made to the provider by BCBS; that is, the Policy did not limit benefits to out-of-pocket costs (*e.g.*, the amount BCBS applied to Ward's calendar year deductible, or her other co-insurance payment requirements under the PPO policy).

[2]    Ultimately the EOBs were obtained in pretrial discovery and the claims were processed and paid by NFL based upon the amounts actually owed.

charges' in industry-wide standards is the amount that you are <u>legally obligated to pay for a specific service</u>…. Health insurance policies are not meant to provide benefits for services for which the insured person is not legally obligated to pay." A457 (emphasis in original).[3]

Ward refused to accept the Department's interpretation and, on March 7, 2003, filed in South Carolina state court a breach of contract action, which Dixie and NFL removed to federal court.  R1.  Seeking to certify a nationwide class of "[a]ll persons who purchased cancer policies" from Dixie, R98, 111, Ward alleged that the Dixie policies promised "to pay claims on the basis of 'actual charges' for certain medical services but paid claims … based on the amount that the insured's public or private third-party health insurer negotiated with the healthcare provider."  R98, ¶ 6; *see also* A154.  Ward further alleged that "actual charges" means "the amount billed by the medical service provider, and without regard to any agreements between medical service providers and third-party insurers."  *Id.* ¶ 7; *see also* A155.

---

[3]    The Department's position was longstanding and has not varied under at least three different Directors.  A1251.  Thus, the Department previously had provided similar responses to other Dixie policyholder requests concerning the meaning of "actual charges."  A460; A462.

**B.    Initial District Court And Appellate Proceedings**

The district court certified a class of South Carolina residents who were "insured during the class period under cancer polices from defendant [Dixie], sold in South Carolina, … [and] paid the amount that the insured's primary health insurer negotiated with the healthcare provider to pay for the medical procedure." A147.  Following cross-motions for summary judgment, the district court granted summary judgment for defendants.  A536-46.  The district court concluded that, under South Carolina contract law, the term "actual charges," as used in Ward's policy, is not ambiguous; rather, it means the real amount of "the charges for which the patient is liable when medical services are rendered, not the fictional amounts indicated on the invoice that the provider does not expect the patient to pay."  A543-44.  Because NFL had properly construed "actual charges" to mean "the amount accepted by the healthcare provider as payment in full," the district court ruled that Ward's breach of contract claim "must necessarily fail."  A544-45. The district court explained:  "Because National has not refused to pay the benefits owed pursuant to the terms of the Policy, as a matter of law, it cannot be found liable to plaintiff for breach of contract."  A545.

On appeal, in *Ward I*, this Court reversed, ordering summary judgment to be entered for Ward on her individual claim. A604-12.[4] This Court held that the words "actual charges," as used in the Policy, were patently ambiguous based upon Ward's representations that she had received bills from her husband's health care providers that listed "non-discounted charges." A607, 609 ("Ward refused to provide [NFL] with the EOB statements because she contended that under the terms of her policy the 'actual charge' was reflected in the non-discounted bill that she received rather than in the EOB," which listed the discounted charges that were owed to the provider). While the Department had interpreted the term "actual charges" to mean "the amount actually owed," certain health care dictionaries defined the term as "the amount actually charged or billed by a medical practitioner for a service." A608 (internal quotations omitted). The Court believed that, in circumstances where there could be an actual difference between the amount "actually charged" and the amount "actually owed," there could be two differing, but reasonable, interpretations of the meaning of "actual charges," yet there was "nothing to indicate whether 'actual charges' is best understood to mean

---

[4]    On October 5, 2007, this Court initially held that the term "actual charges" was ambiguous, reversed the district court's grant of summary judgment for defendants, and remanded for further proceedings. *See Ward v. Dixie Nat'l Life Ins. Co.*, No. 06-2022, 2007 WL 2914954 (4th Cir. Oct. 5, 2007). Ward and the defendants moved for a panel rehearing, which this Court granted. On November 29, 2008, this Court amended its opinion, holding that the term "actual charges" was *patently* ambiguous and therefore must be resolved in favor of Ward as a matter of law. A604-12.

the amount actually billed or the amount actually owed." A608. Applying then-applicable South Carolina common law rules of insurance policy construction, the Court resolved the ambiguity in Ward's favor and held that "actual charges" means the amount listed on the provider's bill received by the patient. *Id.*

### C.    Section 38-71-242 And Proceedings On Remand

Following this Court's decision, both houses of the South Carolina General Assembly unanimously passed a statutory definition of "actual charges" that was sponsored by the Department. Signed into law by the Governor on June 4, 2008, S.C. Code Ann. § 38-71-242; A762-65, this statute defines the term "actual charges" in *all* specified disease insurance policies issued in South Carolina that contain but do not define the term. Under the statutory definition, "actual charges" means the *lower* of the amount that a health care provider either "agreed to accept, pursuant to a network or other agreement with a health insurer …, as payment in full for the goods or services provided to the insured," or "agreed or is obligated by operation of law to accept as payment in full for the goods or services provided to the insured pursuant to … Medicare …, where the insured is covered or reimbursed by such program." S.C. Code Ann. § 38-71-242(A)(1). As of June 4, 2008, section 38-71-242 prohibits any insurance company doing business in South Carolina from paying "actual charges" claims or benefits under specified disease

policies that exceed the amount permitted under the statute and that are outstanding as of June 4, 2008.  *Id.* § 38-71-242(C).

As interpreted by the Department in a regulatory bulletin addressed to all insurers of supplemental cancer and other specified disease policies in South Carolina (including NFL), A1250-52,[5] section 38-71-242 codifies the Department's "longstanding interpretation" of the term 'actual charges' or similar wording in supplemental cancer policies."  Regulatory Bulletin No. 2008-15 ("Bulletin"), A1251.  The Bulletin explains that the statute reflects important legal and public policy considerations, including (i) ensuring that "actual charges" benefits under specified disease insurance policies are based upon actual, out-of-pocket losses suffered by insureds; (ii) ensuring that premiums for such policies remain affordable; and (iii) protecting against collusive or potentially fraudulent conduct by insureds and health care providers.  *Id.*  Finally, the Bulletin provides that section 38-71-242 applies to all outstanding claims under supplemental cancer policies that were not reduced to a final judgment as of June 4, 2008.  *Id.*

Shortly after enactment of section 38-71-242, defendants moved for judgment on the pleadings, arguing that this statute precluded defendants from paying Ward's and the class's claims because they exceed the amounts defined in

---

[5]    "Bulletins are the method by which the Director of Insurance formally communicates with persons and entities regulated by the Department.  Bulletins are Departmental interpretations of South Carolina insurance laws and regulations and provide guidance on the Department's enforcement approach…." A1252.

the statute, *i.e.*, the amounts the providers accepted as payment in full.  A760-65; R321.  The district court denied the motion, A766-73, holding that section 38-71-242 cannot apply to the claims of Ward or the class, because the statute "does not constitute a dramatic change in legal authority that would permit a deviation from the Fourth Circuit's mandate in its decision interpreting the law of insurance in South Carolina at the time the decision was rendered."  A772.  The district court initially held that "[n]othing in either the legislative history or the language of § 38-71-242 unambiguously indicates that the statute is to be applied retroactively to cases currently pending, in any form," *id.*, although the court subsequently recognized that the legislature had intended to "modify the [Fourth Circuit's] interpretation" of actual charges.  A1475.  The court nonetheless believed that "the law would not allow" the state legislature to alter the rules of contract construction, even for insurance claims not yet paid, and that the Fourth Circuit's decision had "fixed" the rights of the parties.  A1474-75.

Ultimately, the district court refused to decertify the class, R319, and, on November 12, 2008, granted summary judgment to Ward and the class.  In the district court's view, this Court's decision in *Ward I* required it to enter summary judgment, but did not require that each class member submit proof that he or she had been "actually billed" a higher amount than what the EOB showed as the pre-negotiated charge.  Rather, the district court held that Ward and the class were

18

entitled to contract damages as a matter of law, even absent any proof that they had ever received any provider bills. A1458-70; R374. The district court subsequently held an evidentiary hearing on damages, A1767-1818; R393, at which no class member or provider testified and no provider bills were offered or admitted into evidence.

## SUMMARY OF ARGUMENT

At issue in this case is whether the federal courts are bound to apply state legislative enactments that provide a definition of an undefined term in an insurance policy. In *Ward I*, this Court held that the policy term "actual charges" was patently ambiguous: it could reasonably mean either "the amount shown on the [provider's] bill sent to the patient" (as Ward claimed) or the pre-negotiated amount the provider is actually owed for services rendered (as defendants and the Department had interpreted the term). A608. Under then-existing South Carolina common law rules of contract construction, this Court held that it was required to resolve this ambiguity in favor of Ward's reasonable interpretation. On remand, the district court misread this Court's decision and in so doing committed legal error.

*First*, in disregarding the State's enactment of section 38-71-242, the district court erroneously refused to apply a state statute on the grounds that the *state legislature* had no authority to define the term "actual charges," because this Court

19

had ruled in *Ward I* that common law rules of construction governed the term's interpretation.

*Second*, the district court proceeded to disregard this Court's holding in *Ward I* by allowing this action to proceed as a class action, even though individual billing issues predominate over common issues of fact, and even though Ward's interests are antagonistic to the interests of a substantial number of class members.

*Third*, the district court also disregarded this Court's holding in *Ward I* by declining to require proof that each class member had received provider bills demanding payment of amounts higher than the amount actually owed the provider. This was all the more egregious as applied to class members who are Medicare beneficiaries, because it is *illegal* for a provider to bill a Medicare beneficiary an amount higher than what Medicare pays providers for their services, and there was no evidence that any provider violated federal law. In addition, the district court abused its discretion in awarding damages on summary judgment based entirely upon controverted, inadmissible hearsay. Finally, the district court erred in disregarding uncontroverted evidence establishing that each class member's damages should be offset by the additional amount class members would have paid in premiums had NFL paid benefits in accordance with the higher amounts supposedly billed.

20

For these reasons, the district court's judgment should be reversed and judgment entered on the pleadings for defendants or, in the alternative, the district court's summary judgment ruling should be reversed.

## STANDARD OF REVIEW

This Court reviews *de novo* the denial of a motion for judgment on the pleadings, *see In re Wildewood Litig.*, 52 F.3d 499, 502 (4th Cir. 1995), and the grant of summary judgment, *see JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Class certification orders and evidentiary rulings are reviewed for abuse of discretion. *See United States v. Vidacak*, 553 F.3d 344, 348 (4th Cir. 2009); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 465 (4th Cir. 2006). A district court abuses its discretion where, as here, "its decision is guided by erroneous legal principles." *Martin v. Stewart,* 499 F.3d 360, 363 (4th Cir. 2007).

## ARGUMENT

### I.    SECTION 38-71-242 BARS ALL CLAIMS IN THIS CASE.

Shortly after *Ward I*, the South Carolina legislature enacted section 38-71-242. This provision provides that the Department's longstanding interpretation of "actual charges" shall be the default definition of "actual charges" whenever that term is left undefined in a specified disease policy. It thus rejects Ward's

21

definition of "actual charges" and abrogates the common law rule of construction requiring that ambiguous contract terms be interpreted in the insured's favor, as that rule is applied to the term "actual charges" in policies like Ward's. By its terms, section 38-71-242 applies to the unpaid claims pending in this litigation.

The district court erred in holding to the contrary. Although the district court recognized that it was required to apply the law in effect at the time, A770, it held that, under the "mandate rule," it had no authority to apply a definition of "actual charges" that conflicted with *Ward I*'s interpretation. A772. But it is well established that a prior decision must yield where "controlling legal authority has changed dramatically." *Invention Submission Corp. v. Dudas*, 413 F.3d 411, 415 (4th Cir. 2005); *see also Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 n.14 (D.C. Cir. 1990) ("When intervening legal authority makes clear that a prior decision bears qualification, that decision must yield. 'Law of the case' cannot be substituted for the law of the land.") (internal quotation omitted). Contrary to the district court's belief, A1475, the state legislature has authority to alter common law rules of construction.

As explained below, the presumption against retroactivity provides no basis for ignoring section 38-71-242. The presumption is not triggered at all because the state legislature "has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). Moreover, section 38-71-242 has no

22

retroactive effect as applied to the prospective payment of claims outstanding in this case. This Court's decision did not confer on Ward any "vested rights" in a state common law rules of contract construction. Finally, as the district court recognized, A1474-75, the legislature and the Department intended that section 38-71-242 would govern the claims in this case.

### A.    The Legislature Prescribed The Reach Of Section 38-71-242.

The presumption against retroactivity is not a firm prohibition. Rather it is "merely [a] rule[] of construction" designed to aid in determining whether the legislature intended a statute to have prospective or retroactive application. *Jenkins v. Meares*, 394 S.E.2d 317, 319 (S.C. 1990); *see also Republic of Austria v. Altmann*, 541 U.S. 677 (2004) (upholding the retroactive application of the Foreign Sovereign Immunities Act to permit a suit that would have otherwise been precluded at the time of foreign government's improper conduct). It thus only comes into play if the statute at issue "is shown to have no firm provision about temporal reach." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 40 (2006); *see also Landgraf*, 511 U.S. at 280. If the legislature has expressly proscribed the statute's reach, such that the statute makes plain to what conduct it applies, then no presumption is necessary. *See United States v. Jackson,* 480 F.3d 1014, 1018 (9th Cir. 2007).

After a deliberative bi-partisan legislative process, the South Carolina legislature left no doubt as to the reach of section 38-71-242. Subsection (C) speaks clearly: "*after the effective date of this statute* [June 4, 2008], an insurer … shall not pay any claim or benefit based upon an 'actual charge'… in an amount in excess of the 'actual charge' … as defined in this section." S.C. Code Ann. § 38-71-242(C). As the Department has explained, this means that section 38-71-242 applies to all outstanding claims not reduced to a final judgment as of June 4, 2008. A1251.

Thus, section 38-71-242 does not specify merely the date that it will become effective. *Cf. Landgraf*, 511 U.S. at 258 (requiring that a statute include more than just an effective date provision in order to make clear that it applies to conduct that occurred at an earlier date). Subsection (C) makes clear that the statutory definition of "actual charges" applies to *all* claims or benefits not yet paid. Nothing in the statute limits this prohibition to policies that issue *after* June 4, 2008, as the district court concluded; rather, the legislature spoke more broadly of *claims or benefits* not yet paid. Moreover, in subsection (B), the legislature provided that section 38-71-242 "applies" to "*any* individual ... specified disease insurance policy issued to any resident of this State...." S.C. Code Ann. § 38-71-242(B) (emphasis added). And, in subsection (A), the legislature provided that the statutory definition applies when the term "actual charges" is used "in *any*

24

individual … specified disease insurance policy." Read naturally, "the word 'any' has an expansive meaning," and in this setting, it necessarily means "all" such policies, including the policy issued to Ward and the class. *United States v. Gonzales*, 520 U. S. 1, 5 (1997).

The Department has confirmed this interpretation of section 38-71-242's reach. In the Bulletin, the Department explained as follows:

> *Unless expressly required to do so by a final judgment issued before June 4, 2008 by a court of competent jurisdiction*, insurers that have issued supplemental cancer policies or other specified disease policy in this state containing the term(s) . . . "actual charges" and that do not contain an express definition of those terms may not pay any claim or any benefit in excess of the amount specified in S.C. Code Ann. § 38-71-242.

A1251 (emphasis added). Thus, even if section 38-71-242 were at all ambiguous as to its reach (which it is not), as the state agency charged with enforcing section 38-71-242, the Department's interpretation of the statute is entitled to deference by this Court. A608 n.3; *see also Dunton v. S.C. Bd. of Exam'rs in Optometry*, 353 S.E.2d 132, 133 (S.C. 1987).[6]  Because all claims at issue in this case were

---

[6]  In *Ward I*, this Court declined to defer to the Department's interpretation of the "actual charges" on the ground that the Department "has no statutory mandate to pronounce the meaning of a term in an individual insurance policy." A608. Defendants respectfully disagree with that conclusion — although the scope of the Department's authority may not have been clear in *Ward I*, it is well established that the Department has broad regulatory authority over insurance policies sold within the State, *see* S.C. Code Ann. § 38-3-110, including the duty to ensure that the terms of an insurance policy that it approves for sale are *unambiguous*, *see id.* § 38-61-20. The deference question now at issue on appeal, however, is different:

25

outstanding as of June 4, 2008, section 38-71-242 expressly reaches those claims and prohibits defendants from paying those claims in excess of the statutory definition of "actual charges."

### B.    Section 38-71-242 Has No Retroactive Effect.

Even apart from the prescribed reach of section 38-71-242, the presumption against retroactivity has no application here because section 38-71-242 merely "authorizes or affects the propriety of prospective relief," *Landgraf*, 511 U.S. at 273; *see also American Nat'l Fire Ins. Co. v. Smith Grading & Paving, Inc.*, 454 S.E.2d 897, 899 (S.C. 1994) (presumption against retroactivity has an "exception" for "a statutory enactment that effects a change in remedy or procedure"), and does not "produce a retroactive effect when straightforwardly applied." *Fernandez-Vargas*, 548 U.S. at 40.

On its face, section 38-71-242 is prospective. It applies to conduct that has not yet occurred by imposing a future legal obligation on insurers with respect to all claims outstanding after June 4, 2008: "after the effective date of this section [June 4, 2008], an insurer … shall not pay any claim or benefits based upon an actual charge … in an amount in excess of the 'actual charge' … as defined in this

---

the Department indisputably has authority to issue a regulatory bulletin interpreting a statute it is charged with enforcing, *see Sloan v. South Carolina Bd. of Physical Therapists*, 370 S.C. 452, 474 (2006), and, as this Court noted in *Ward I*, that statutory interpretation is entitled to deference, A608.

section." S.C. Code Ann. § 38-71-242(C) (emphasis added). The statute thus codifies the Department's interpretation of "actual charges" (rather than the insured's interpretation) as the default definition whenever that term is left undefined in a specified disease insurance policy, as it is here. Put differently, section 38-71-242 replaces the common law rules of insurance policy construction for "actual charges" claims not yet paid under specified disease insurance policies. It is thus "a change in remedy or procedure" for outstanding claims, to which the presumption against retroactivity has no application. *American Nat'l Fire Ins.*, 454 S.E.2d at 899.

The legislature avoided issues of retroactivity by providing that section 38-71-242 applies only to claims not yet paid, and only to specified disease insurance policies that do not define the term "actual charges." The fact that the statute affects insurance policies issued before its effective date does not alter this conclusion, as the district court erroneously concluded. "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Landgraf*, 511 U.S. at 269 (citation omitted). Rather, a statute only has an impermissible "retroactive effect" where "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties

with respect to transactions already completed." *Id.* at 280; *see also Fernandez-Vargas*, 548 U.S. at 37.

None of these circumstances are present here. Ward had no "vested right" to a favorable common law rule of construction under the law existing at the time her husband incurred his cancer treatment expenses (or when she submitted her claims to NFL). To begin with, "[a] person has no property, no vested interest, in any rule of the common law." *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 88 n.32 (1978) (internal quotations omitted); *New York Cent. R.R. Co. v. White*, 243 U.S. 188, 197-98 (1917) ("No person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit."). Moreover, the Department is charged with ensuring that terms in insurance policies are *not* ambiguous, *see* S.C. Code Ann. § 38-61-20, and it has long taken the position that "actual charges" means the charge that a provider is legally owed, not any amount listed on the provider's bill. A1251. Ward thus had no right, vested or otherwise, at the time of NFL's relevant conduct to a common law rule requiring that ambiguous terms in her Policy be construed in her favor.

Nor was the district court correct in suggesting that this Court "fixed" the rights of the parties when it found the term "actual charges" patently ambiguous. A1474. As noted, the question is whether Ward had a vested right at the time of the underlying conduct. More fundamentally, this Court did not purport to hold,

on an interlocutory appeal, that the state legislature could not alter the definition of "actual charges" for the claims at issue in this litigation. Although the legislature may be precluded from interfering with *final* judgments, *see Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 227-28 (1995), a plaintiff has no "vested right" in a non-final, reviewable judgment. *See American Steel Foundries v. Tri-City Cent. Trades Council,* 257 U.S. 184, 201 (1921) (holding that plaintiff had no "vested right" in decree entered by trial court that was subject to review); *Zeran v. America Online, Inc.*, 129 F.3d 327, 335 (4th Cir. 1997) ("No person has a vested right in a nonfinal tort judgment…."); *Hammond v. United States*, 786 F.2d 8, 12 (1st Cir. 1986) (holding that a right "in tort do[es] not vest until there is a final, unreviewable judgment"). This is particularly true where the purported right at issue is merely a state common law rule of contract interpretation that does not purport to directly confer any rights or prescribe any obligations. Contrary to the district court's suggestion, this Court did *not* hold that the Policy, by itself, entitled Ward to a certain definition of "actual charges"; rather, the Court held only that "actual charges" was ambiguous and thus subject to a common law rule favorable to Ward's interpretation. A609. Ward plainly had no vested right to that common law rule.

Finally, section 38-71-242 clearly does not impose any liability or duties on Ward at all, let alone with regard to a "completed" transaction. *Landgraf*, 511

U.S. at 280. As discussed, section 38-71-242 applies on its face only to *unpaid* claims, and it does not purport to alter any term of an insurance contract — it applies only to policies that do not define "actual charges," and thus, has the effect of rendering the term unambiguous. Rather than imposing any obligation on the *insured*, it speaks directly to *insurers*. *See* S.C. Code Ann. § 38-71-242(C).

### C.    Section 38-71-242 Advances Legitimate Public Purposes.

The district court's decision is all the more erroneous because even if section 38-71-242 were retroactive as applied here (which it is not), it serves legitimate state purposes. *See Shadburne-Vinton v. Dalkon Shield Claimants Trust*, 60 F.3d 1071, 1076 (4th Cir. 1995) (retroactive application of a statute is permissible where "the statute serves a legitimate legislative purpose that is furthered by rational means"). As the Department's Bulletin makes clear, construing the term "actual charges" to mean the fictitious amount printed on a bill, rather than the amount legally owed to the provider, would have significant adverse consequences for insureds in the State of South Carolina. A1249-52. Insurers would be compelled to increase premium rates on existing and new policies, and specified disease insurance policies would become less affordable. *Id.* The legislature thus acted quickly and decisively to clarify the meaning of "actual charges," after this Court deemed the term ambiguous.

30

Even more so in the area of insurance, a federal court sitting in diversity should pay particular attention to the legislature's intent that a statute apply broadly to all claims outstanding. Insurance is a highly regulated field and, under the McCarran-Ferguson Act, the regulation of insurance remains the prerogative of the States. *See* 15 U.S.C. § 1012. The South Carolina Supreme Court has held that the "State of South Carolina is perfectly free to change its mind about how" it administers state programs, *Ken Moorhead Oil Co., Inc. v. Federated Mut. Ins. Co.*, 476 S.E.2d 481, 487 (S.C. 1996), and that there is "no right to rely on the law remaining unchanged in this area," *see id.* at 486 (rejecting claim that retroactive application of statute would impair vested rights). Changes in state regulation are the norm rather than the exception. If it were otherwise, then legislation could "be defeated by private contractual provisions[,]" effectively transferring the power to make laws into the hands of private parties. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224 (1986).

Here, as in *Ken Moorhead*, Ward and the class, all operating in the highly regulated insurance environment, have already been made whole. Each has been reimbursed 100 percent of their liability for the amount the medical providers agreed to accept as payment in full. None had any reasonable expectation that the statutory or regulatory landscape governing their policies would remain unchanged. In fact, the Department consistently informed insureds — before this

action was filed — that an insured had no right to "actual charges" benefits exceeding what providers had agreed to accept as payment in full.  A457-58; A460; A462; A1251.  The South Carolina legislature has now reinforced and codified that longstanding view, and it should be applied to the claims at issue here.

## II.    THE DISTRICT COURT ABUSED ITS DISCRETION IN CERTIFYING AND REFUSING TO DECERTIFY THIS CLASS ACTION.

A plaintiff seeking to certify a class must establish, among other things, that "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a), and that "questions of law or fact common class members predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3).  Following this Court's decision in *Ward I*, defendants moved to decertify the class on the grounds that Ward had failed to satisfy both the predominance requirement and the adequacy requirement.  A613-14.  NFL argued that myriad individualized factual questions would dominate this litigation, including what individual class members were actually billed for health care services and whether individual members were actually sent a bill in the first instance.  In addition, defendants argued that Ward could not adequately represent the class because she is primarily concerned with receiving damages from this

32

lawsuit, and has no apparent concern for the increased premiums that will befall the entire class.

## A.    Individual Issues Of Fact Predominate Over Common Questions.

Although this Court reviews the district court's certification decision for an abuse of discretion, *see, e.g.*, *Deiter*, 436 F.3d at 465, where, as here, the district court bases its decision on a misunderstanding of controlling law, it abuses its discretion.  *See, e.g.*, *United States v. Srivastava*, 540 F.3d 277, 287 (4th Cir. 2008) ("We recognize that a district court necessarily abuses its discretion when it makes an error of law.").  That is precisely what the district court did here.

This Court held in *Ward I* that the term "actual charges" in Ward's Policy could reasonably mean the higher "amount actually billed" Ward by the health care provider — as opposed to the discounted amount the provider was legally owed.  A608.[7]  In other words, the Court found an ambiguity in the Dixie policies based

---

[7]    In no less than four separate places in its opinion, this Court emphasized that the term "actual charges" was ambiguous because it could mean the amount listed on a bill received by the patient, rather than the amount a provider accepts for payment in full, which is shown on the EOB.  A608 ("The words 'actual charges' could also be understood to mean the amount *shown on the bill sent to the patient* regardless of whether this amount is the same as the amount actually owed."); *see also id*. ("Viewed from within the four corners of the policy, the phrase is ambiguous as there is nothing to indicate whether 'actual charges' is best understood to mean the amount *actually billed* or the amount actually owed."); *id*. ("In contrast to the view taken by the Department of Insurance, numerous health care dictionaries define 'actual charge' as the *amount billed*."); *id*. ("'actual charge. the amount a physician or other practitioner actually *bills* a patient or his insurance

on plaintiff's representation that she had received bills showing higher, non-discounted amounts as the provider's charges. In order to follow this Court's mandate faithfully, therefore, the district court should have considered whether each of the class members actually received a "bill" or "invoice" from his or her health care provider. But that question raises numerous factual and evidentiary issues, such as, for example: (i) what documentary or other evidence is sufficient to constitute a "bill" from the provider and received by the patient; (ii) is an EOB from the primary health insurer sufficient evidence of the "amount billed" where the EOB expressly states that "THIS IS NOT A BILL"; and (iii) does an account summary that states on its face PPO adjustments for the amount charged for services and that is generated by a provider at the patient's request, after the services were provided, constitute a "bill" or demonstrate that the "amount billed" was higher than the "amount charged"?

In denying NFL's motion to decertify the class, however, the district court concluded that "[t]his is not that complicated, in my view, compared with what I have had to deal in other cases…. The problem is not going to be me sorting through a lot of conflicting pieces of paper…." A730. The proper inquiry for class certification is not, however, whether the district court itself will be burdened by "sorting through" individual factual questions. Instead, the proper inquiry is

for a medical *service* or *procedure*.'" (quoting Lee Hyde, The *McGraw-Hill Essential Dictionary of Health Care* 133 (1988))).

whether individual issues of fact predominate. To make that determination, "[t]he nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). Where, as here, "the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question" that predominates. *Id.* "[T]he [district court's] record must affirmatively reveal that resolution of the [billing issue] on its merits may be accomplished on a class-wide basis." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006).

The record reveals no such thing. Indeed, Ward failed to proffer *any* evidence (non-hearsay or otherwise) demonstrating that each class member was actually billed an amount higher than the amount accepted as payment in full by the provider. Under *Ward I*, this class should have been decertified for lack of any common evidence demonstrating higher billing amounts; indeed, as discussed *infra* in Section III, the district court erred in not requiring any billing evidence at all.

Another district court addressing class certification in a very similar case recognized that individual facts predominate. In *Pipes v. Life Investors Ins. Co. of America,* plaintiffs brought a putative class action on behalf of cancer policyholders, claiming that the defendant was required to pay "actual charges" benefits equal to the "amount billed." No. 1:07CV00035, 2008 WL 5328201 at *1

35

(E.D. Ark. Nov. 21, 2008).   Plaintiff insisted that class damages could be determined easily by accessing the defendant's computerized claims data.   The *Pipes* court rejected that argument because that data showed only providers' non-discounted "list prices" obtained from EOB statements, and these list prices simply "do not necessarily represent the 'amount billed.'"   *Id.* at *7.

*Pipes* is on all fours with this case.   Just as in *Pipes*, Ward has failed to satisfy the predominance requirement because "a determination of the 'amount billed' for healthcare services is a complicated task that requires consideration of individualized evidence."   *Id.* at *6.   To prove that each class member is owed the higher "amounts billed" by providers, Ward cannot rely — as she did below — on provider "list prices" obtained from EOBs (which, as discussed in Section III.C *infra*, are themselves inadmissible hearsay).   Instead, Ward should have been required to submit individualized billing evidence for each class member, which would have rendered any class action an unmanageable morass of confusing and time-consuming mini-trials on damages.

**B.    Ward's Interests Are Adverse To The Interests Of Many Class Members.**

Ward also failed to show that she adequately represents the class.   Under Rule 23(a), plaintiffs cannot fairly and adequately protect the interests of the class they seek to represent if the claim they pursue is antagonistic to the interests of

36

other class members.  *See Hansberry v. Lee*, 311 U.S. 32, 44-45 (1940); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338-39 (4th Cir. 1998). Indeed, the Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight Sys. Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974)).  "The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members." *Broussard*, 155 F.3d at 338.

Rule 23 does not permit class certification where, as here, members have starkly differing interests with respect to a key issue:  the appropriate relief.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) (rejecting a single class comprised of both present and future asbestos plaintiffs); *Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 305-06 (4th Cir. 1991).  Not even a common interest in establishing liability can overcome such a fundamental conflict.  *See, e.g.*, *In re GMC Pick-Up Truck Fuel Tank Litig.*, 55 F.3d 768, 800 (3d Cir. 1995). Indeed, this Court has previously rejected a single class comprised of both present and former franchise owners on the ground that certain putative "plaintiffs' residual, forward-looking interest, as current franchisees, in Meineke's continued

viability would have tempered their zeal for damages and prejudiced the backward-looking interests of former franchisees." *Broussard*, 155 F.3d at 338.

There is no doubt that the putative class here is rife with conflict. The current class encompasses at least three distinct groups: (i) former policyholders who have no personal stake in preventing higher premiums as a result of large damages awards; (ii) current policyholders who will receive windfalls in damages that exceed future premium increases; and (iii) current policyholders who stand to lose on net because their insurance premiums will be greater than their individual damages award. As Ward's own actuarial expert, NFL's actuarial expert, and Ward herself all concluded, if Ward prevails in this action, the net result will be that all class members will receive monetary damages, and premiums will increase for all Dixie cancer policyholders, including for those class members who are current policyholders, in order to account for the increased amount of paid claims. A616-17; A645-46; A655-57. In other words, this suit will cost most of the current policyholder class members money in the form of higher premiums. For some current policyholders, those damages will be greater than any increase in premiums. In many instances, the resulting premium increase will be *greater* than any damages recovered by individual class members. Former policyholders, on the other hand, will not suffer any adverse results by the increased premiums borne by the rest of the class.

Ward cannot adequately represent all three groups when she is electing the remedy of a significant damages award. Although this election of remedies will certainly benefit former policyholders, it clearly creates a conflict to "[p]ursu[e] a damage remedy that [is] at best irrelevant and at worst antithetical to the long-term interests of a significant segment of the putative class" — namely those current policyholders who will suffer a net loss because of higher premiums. *Broussard*, 155 F.3d at 339. In such a situation, many class members may choose not to renew their cancer policies due to higher premiums, thereby causing them to drop what could be valuable insurance coverage. Indeed, some class members have already testified that they will likely drop their cancer insurance coverage if their premiums are increased significantly. A659-60; A662-64. Ward's interest in pursuing a large damages award, therefore, is clearly antagonistic to the interests of many, if not most, of the other class members. The district court abused its discretion in certifying the class (and refusing to decertify it).

## III.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO WARD AND THE CLASS.

Having refused to decertify the class, the district court proceeded to grant summary judgment without requiring *any* evidence that either Ward or class members had actually received a bill from a provider that listed a higher amount than what the provider accepted as payment in full. A1463-64. In so doing, the

district court deviated from this Court's instruction in *Ward I*. Absent evidence that the insured received a bill, no proof exists that there is a difference in "the amount actually billed" and "the amount actually owed," A608, and there is therefore no proof of damages.

Additionally, the district court erred in granting summary judgment for Medicare-insured class members for an independent reason: it is *illegal* for a provider to bill a Medicare patient more than the Medicare-approved amount, and there was no evidence here that any provider violated federal law. The district court also erred in awarding damages on summary judgment based upon inadmissible "claim spreadsheets" rather than actual bills demanding a higher payment. And finally, the district court erred in refusing to follow black letter law requiring that damages be offset by the higher premiums that NFL demonstrated it would have charged class members in the non-breach world.

### A.  Ward And The Class Failed To Demonstrate That They Were Actually Billed Amounts Greater Than The Amounts Their Providers Accepted As Payment In Full.

Both before the district court and this Court, Ward argued that "actual charges" means the amount stated in "*the non-discounted bill that she received* [from medical providers] rather than in the EOB." A607 (emphasis added); *see also* A137 ("The 'actual charge,' *as defined by the plaintiff*, is the *amount billed* a patient by a healthcare provider.") (emphasis added); A155, ¶ 7; A578-79. In

40

*Ward I*, this Court agreed that Ward's interpretation of "actual charges" was reasonable, and therefore, under South Carolina common law rules of contract interpretation, must apply. A608. Central to the Court's reasoning was its understanding that Mr. Ward's providers had actually billed him in excess of the amounts the providers were actually owed and paid for (as stated in the EOB statements). A606 ("Regardless of the *amounts billed* to James [Ward]....") (emphasis added). Absent a bill with an amount different from the amount on the EOB, no competing reasonable interpretation would exist as to the meaning of "actual charges."

On remand, however, both Ward and the district court jettisoned this Court's specific understanding that "actual charges" is ambiguous because the patient receives a bill showing a charge amount different from what appears on the EOB statement. Instead, Ward asserted that this Court held that "actual charges" means the hypothetical "full amount a medical provider charges for a service rather than the discounted or negotiated rate the medical provider may have agreed to accept from third-party governmental or private health insurers." R341:3 n.1. No such definition or holding appears in the Court's opinion. To the contrary, this Court endorsed Ward's position that "actual charges" means "the *amount shown on the bill sent to the patient* regardless of whether this amount is the same as the amount actually owed." A608 (emphasis added); *see also* p. 32 note 7, *supra*.

41

A faithful reading of *Ward I* requires that "actual charges" be based on and tied to actual bills sent by a provider and received by the patient; they cannot be based on a provider's hypothetical "full amount" or "list price" charges that are never billed to the insured. Moreover, under the law of this Circuit, Ward is estopped "from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court." *Zinkand v. Brown,* 478 F.3d 634, 638 (4th Cir. 2007). Accordingly, in order to determine whether defendants owe any additional amount, the district court should have followed this Court's (and Ward's) definition of "actual charges" — the "amount billed" the patient by the provider.

The district court, however, accepted Ward's revised definition of "actual charges." Although Ward submitted neither provider bills nor affidavits from class members stating, under oath, that they received bills from their medical providers demanding payments greater than what the provider accepted as payment in full or what NFL paid them in benefits, the district court "declin[ed] to place undue significance on the medical patient's receipt of an initial [non-discounted] bill," and held that Ward was not required to present such evidence. A1463. Instead, the district court held that Ward and the class need only show the difference between the charges a medical provider "*typically associates with medical services*" and "the lower amount the medical provider has agreed to accept … as payment in full for the services." *Id.* (emphasis added). In other words, the district

42

court found it sufficient to identify any amount the provider *could theoretically charge* for its services, regardless of whether each class member was actually billed that amount or whether the provider ever demanded payment of that amount. The district court referred to this as the "fictional amount," A1464, and calculated damages based on this fiction. This was doubly wrong: it renders the Policy's use of the terms "loss" and "actual" meaningless and impermissibly deviates from this Court's decision in *Ward I*.

The district court thus erred as a matter of law by misconstruing this Court's definition of "actual charges" and relieving Ward of the evidentiary burden that this Court mandated. In particular, *Ward I* required Ward to show, for both herself and each class member, that (i) they actually *received* "bills" from their respective health care providers actually seeking payment, A608, (ii) that each such "bill" demanded an amount greater than the amount the provider agreed to accept as payment in full for its rendered services, A607-08, and (iii) therefore, Ward and the class were actually billed amounts greater than what NFL already paid them in benefits. Absent such evidence, there is no basis for awarding any damages.

### B.    The District Court Erred In Granting Summary Judgment For Class Members Who Are Medicare Beneficiaries.

The district court further erred in granting summary judgment for class members who are Medicare beneficiaries (A1254-55, ¶ 3), because it is illegal

under Medicare for a provider to bill a patient more than the Medicare-approved amount.

Under Medicare Part B, physicians are paid a predetermined amount for each service provided, without regard to the physician's usual or full billed charges. A1274, ¶ 13 (citing 42 U.S.C. §§ 1395l(a), 1395w-4(a)(1); 42 C.F.R. § 414.21).[8] Federal law prohibits physicians and others from billing more than this Medicare allowable amount and imposes civil and criminal penalties on those who submit bills that exceed it. *See* 42 U.S.C. §§ 1320a-7a(a)(2), 1320a-7b(e); A1277-78, ¶¶ 25-29.

As a result of these statutorily mandated caps, there can never be an "actual charge" (*i.e.*, an "amount billed") to a Medicare patient that exceeds the amount the provider accepted as payment in full — unless the provider is in violation of federal law. The district court acknowledged this fact. A1465. The district court also acknowledged that "there is no evidence in this case that any provider billed or attempted to collect an amount which exceeds Medicare's maximum allowable charge for services...." *Id*. Yet, the district court refused to follow these facts to

---

[8]     Approximately 99% of all physicians either participate in or accept assignment from Medicare. *See* U.S. Govt. Accountability Office, Medicare Physician Services, GAO-06-704 at 39 (July 2006). Physicians who neither participate nor accept assignment are permitted to bill more than the ordinary fee schedule amount, but only by 9.25%. *See* 42 U.S.C. § 1395w-4(g)(1)(A)(i). This 109.25% amount is referred to as the "limiting charge." This category of physicians is not apparently involved in this case.

their logical conclusion:  because no provider could have billed a Medicare class member for "actual charges" in an amount greater than the approved amount, there can be no ambiguity as to the meaning of the phrase "actual charges" in these class members' policies, and no Medicare class member could have suffered any damages.

The district court, however, ignored its own findings and federal law.  It did so for two reasons.  First, the court believed that Medicare class members should be treated no differently from class members with private primary health insurance:  "If actual charges can extend to a fictional amount a medical provider never expects a person with private primary health insurance to pay, it extends just as well to charges a medical provider knows a Medicare patient will not pay."  *Id*.  This again ignores the very premise of liability in this case:  the insured must have been billed a higher amount than what the provider is legally owed under the PPO policy.  That simply is not possible under Medicare law.

Private insurance contracts are decidedly not on a par with federal Medicare law.  Medicare makes billing in excess of the allowable charge illegal, and indeed, subject in some circumstances to criminal penalty.  Yet the district court assumed (without any evidentiary support) that these "billings" somehow occurred.  If such illegal billings existed, they could not form the basis of an enforceable contract.  In South Carolina, as in virtually all States, the well-established rule "is that courts

will not enforce a contract when the subject matter of the contract or an act required for performance violates public policy as expressed in constitutional provisions, statutory law, or judicial decisions." *White v. J.M. Brown Amusement Co., Inc*., 601 S.E.2d 342, 345 (S.C. 2004).[9]

Second, the district court suggested that ambiguity persists in the Medicare world because a Medicare Summary Notice (*i.e.*, explanation of medical benefits) "show[s] two charges associated with medical services, and the question in this case is which charge is relevant for the purpose of calculating benefits" under the defendants' policies. A1465. This is contrary to the undisputed evidence. The Medicare Summary Notice ("MSN") contains a field labeled "Amount Charged" and another labeled "Medicare Approved." A1259. It contains no field labeled "Actual Charges." Defendants' Medicare expert, the former Deputy Chief Counsel for the Centers for Medicare & Medicaid Services, submitted undisputed declaration testimony that the "Amount Charged" field refers to the "usual charge," the amount that the provider bills commercial patients at least fifty

---

[9]     The district court also suggested that providers would not really violate federal Medicare law, because they "billed" "fictitious" amounts that bore no relationship to reality or what they anticipated receiving. If this is correct, however, that "fictitious" amount went into the statistical mix to calculate future fee schedule payments, which is arguably a violation of the False Statements Act, 18 U.S.C. § 1001. There is simply no safe harbor for fabricating data in federal forms.

percent of the time, A1276, ¶ 18,[10] and that Medicare gathers this information only for statistical purposes.  It has no bearing on what the patient owes or what the provider actually bills Medicare.  *Id.* ¶¶ 18-19; *see also* CMS Carrier Manual § 10.3.10.2 (CMS Pub. 100-04) (Oct. 1, 2003), http://www.cms.hhs.gov/manuals/ downloads/clm104c21.pdf (indicating that there should be no difference between the "Amount Charged" and the "Medicare Approved" amount).

Plaintiffs submitted no evidence suggesting that Medicare class members reasonably believed that the "Amount Charged" field created an ambiguity as to the amount they owed the provider, or required an additional payment to the provider.  Indeed, as a matter of law, Medicare beneficiaries could not *reasonably* believe it did.  A yearly Medicare pamphlet sent to all Medicare beneficiaries expressly instructs beneficiaries that, for assigned services, they pay only 20% of the Medicare approved amount plus the deductible.  *See* MEDICARE & YOU 2009, http://www.medicare.gov/Publications/Pubs/pdf/10050.pdf; 42 U.S.C. § 1395b-7.  Thus, nothing in the MSN or in the Medicare program could have created the pivotal ambiguity that this Court discerned.

---

[10]    Indeed, because the "Amount Charged" means the amount the physician charges commercial patients at least fifty percent of the time, each class member must demonstrate, even under the district court's misguided theory, that he or she was one of those "fifty percent."  No such evidence was introduced.

## C.    The District Court Erred In Granting Summary Judgment On Damages Based On Double Hearsay.

Because the district court disregarded this Court's requirement that damages be based on bills actually sent to the insured by the provider, in granting summary judgment, the district court turned to a different, impermissible type of evidence to award damages:   six "claim spreadsheets" that purport to summarize third party EOBs.   A777-803; A804-13; A814-27; A828-921; A922-34; A997-1071.   These spreadsheets are inadmissible hearsay, and the district court abused its discretion in relying on them to grant summary judgment.

Five of the six claim spreadsheets were prepared and produced by NFL *during discovery in this case*.  A1254-55.  They set forth individual class members' claim information from 1996 through September 2005.   *Id*.   NFL obtained this information from class members' EOB statements, which were prepared by primary health insurers (not providers) and submitted by class members.   *Id*.  The sixth spreadsheet reflects class members' claim information from 2005 through June 4, 2008.  R341-2:4.   This spreadsheet, however, was prepared by Ward's counsel, *during the course of litigation*, based upon his personal inspection of EOB statements contained in NFL's claims files.[11]   *Id*.

---

[11]    Ward's damages calculation is purportedly based upon the difference between the amounts stated in the "Amount Submitted"/"Invoice Amount" columns of the spreadsheets and the "Paid Amount" columns.  R341-2:4-5.

As a matter of black letter law, these spreadsheets constitute inadmissible hearsay, *i.e.*, out-of-court statements offered solely to prove the truth of the matters asserted.  Here, Ward proffered these spreadsheets to prove the amount of damages class members allegedly suffered.  Although the district court did *not* disagree that the spreadsheet evidence is hearsay, it nevertheless held that the spreadsheets were admissible, and sufficient to establish summary judgment, for two equally impermissible reasons.

*First*, the district court overruled NFL's objection to the use of these six claim spreadsheets because the district court did not "want to have a trial and bring in 12 jurors the week of Christmas to bring in 167 plaintiffs and five or six hundred medical providers to give testimony so as to avoid … a hearsay exception." A1812.  Although NFL explained that the "spreadsheets capture[] information from the EOBs provided by the medical providers" and, therefore, are "not part of [NFL's] business records," the district court nevertheless appeared to overrule NFL's objection to this hearsay evidence because it would otherwise "necessitat[e] a hearing requiring all those medical providers who gave us the EOBs[,] which could number in the thousands."  A1814.

While a district court has wide latitude to manage its docket, a court abuses its discretion when that management "indicates 'an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'"

*United States v. Clark*, No. 98-4142, 1999 WL 22753 at *1 (4th Cir. Jan. 21, 1999).  Here, NFL's request for a trial on damages was more than justified — the district court awarded nearly $8 million in damages based solely on this hearsay evidence.  A1825-32; R403; R404.

*Second*, the district court overruled NFL's objection "because the data [in the spreadsheets] [was] obtained by [NFL] from primary health insurer EOB statements" and, according to the district court, "defendants relied on those forms in cataloguing their payment of benefits."  A1822.  Accordingly, the district court determined that the spreadsheets were admissible under the business records exception (Fed. R. Evid. 803(6)), because the court believed that "there is law that if a business used business records produced by other entities as part of its internal operation in making its own calculations and paying benefits, that they almost incorporate by reference another company's business records into its own business records."  A1814.  Applying this vague and legally incorrect standard, the district court found that NFL had relied upon the "provider's charge" amounts stated in EOB forms to pay "actual charges" benefits under the Dixie policies.  A1822.

But there is no such record evidence to support the district court's finding, and the court abused its discretion in failing to consider the disputed facts in the light most favorable to NFL.  Indeed, contrary to the district court's "finding" (which is, of course, entirely impermissible on summary judgment), the record

establishes that prior to the time NFL started paying "actual charges" benefits based upon the amount accepted by the provider as payment in full, Dixie and NFL both relied upon the charge amounts stated in *provider bills*, not EOBs, to pay these benefits.  A606.

But even assuming that it were undisputed that NFL relied upon *EOBs* to pay claims (which it is not), the district court also abused its discretion in admitting the *spreadsheets* under the business records exception.  The spreadsheets proffered by Ward are made-for-litigation documents that merely purport to summarize EOBs, which Ward *never offered into evidence*.  Moreover, the EOBs themselves are inadmissible hearsay evidence,[12] which therefore makes the claim spreadsheets summarizing them *double-hearsay evidence*.  They obviously do not satisfy the business records exception.

---

[12]    As the district court properly recognized, third-party EOB forms "are not developed [by insurers] for the purpose of tracking the higher 'fictional cost' of medical services, nor are they developed by persons having a duty to accurately report that cost."  A1821.  Given these undisputed facts, EOB statements cannot be admissible as business records.  *See United States v. Hussein,* 151 F. App'x 257, 259 (4th Cir. 2005) ("The essential premise underlying the business records exception is that 'each actor in the chain of information is under a business duty or compulsion to provide accurate information.'") (quoting *United States v. McIntyre*, 997 F.2d 687, 699 (10th Cir. 1993)).  Thus, the fictional "provider's charge" amounts contained in EOBs are inadmissible hearsay.  *See M.J.T. v. State of Fla.*, 927 So. 2d 1077, 1078 (Fla. Dist. Ct. App. 2006) (holding that explanations of medical benefit forms were inadmissible on hearsay grounds as evidence of a party's medical costs absent testimony from appropriate records custodian).

Under the business records exception, documents containing hearsay are deemed admissible only where "the document [is] prepared by someone acting 'in the course of a regularly conducted business activity.'" *Rowland v. American Gen. Fin., Inc.*, 340 F.3d 187, 194 (4th Cir. 2003) (quoting Fed. R. Evid. 803(6)). Where, as here, "the supplier of the information does not act in the regular course [of business], an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail." *Id*. at 194-95 (quoting Fed. R. Evid. 803 advisory committee's notes). Here, Ward did not offer any foundational testimony to establish the admissibility of the spreadsheets as NFL's business records. To the contrary, it is undisputed that these spreadsheets *were not* prepared and generated by NFL in the regular course of business, but in response to discovery requests propounded by Ward. A1255. But a party's production of documents prepared in the course of litigation does not, by itself, establish their admissibility under the Federal Rules of Evidence. *See, e.g.*, *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 205 (4th Cir. 2000) (documents made in anticipation of litigation are inadmissible under the business records exception because their made-for-litigation purpose lacks the same indicia of reliability as records created and maintained "for the systematic conduct and operations of the enterprise"). [13]

---

[13]     The only information before the district court regarding how the sixth

In short, the district court's damages award and judgment were based upon inadmissible hearsay and cannot stand. Neither the district court's preference for avoiding a lengthy trial, nor the erroneous factual finding that NFL relied upon EOB data to pay benefits, supports a hearsay exception to admit the summary claim spreadsheets as substantive proof of damages.

**D.** **The District Court Erred In Failing To Offset Damages By The Higher Premiums Ward And Class Members Would have Paid In The Non-Breach World.**

Finally, the district court erroneously failed to follow well-established law regarding the correct measure of damages when it rejected NFL's unrebutted evidence that the claimed class damages should be reduced or offset. That evidence demonstrated that Ward and the class members would have paid NFL higher insurance premiums in the non-breach world. This is yet another example of how the district court, on Ward's summary judgment motion, improperly construed disputed facts in the light most favorable to Ward, not NFL. In this critical regard, NFL maintained below that, had it paid the additional benefits awarded by the district court at the time the class members' claims were submitted,

---

supplemental claim spreadsheet (A997-1071) was generated is Ward's counsel's unsworn assertion that he obtained the information by reviewing certain claims files produced by NFL. R341-2:4. What specific documents contained in these files were used by Ward's counsel to determine the claim information listed in the spreadsheet is not known. If EOB statements were used, then the supplemental spreadsheet is, as discussed above, inadmissible hearsay.

all Dixie policyholders, including Ward and all class members, would have paid higher annual premiums to NFL than they actually paid in each relevant year to offset the increased benefit payments to policyholders. A1294-95. This conclusion is inescapable because the policy's premiums are adjusted annually to take into account payouts in claims in the prior year: the higher the claim payouts, the higher the premium. A1290-91. Ward did not submit any evidence contradicting these facts.

Based upon these uncontroverted facts, NFL submitted, in response to Ward's summary judgment motion, the report and testimony of an actuarial expert, D. Joeff Williams,[14] to address and calculate what additional premiums Ward and each class member would have paid if NFL had paid the claimed $7.8 million in additional benefits under the Dixie policies. A1288-1350. Mr. Williams' analysis shows that if Ward's and all class members' damages claims are included, damages must be reduced or offset by no less than $2,672,114 in increased premiums that plaintiff and the class members would have paid in the "non-breach" world. A1290-91, ¶ 7; A1330-34. In addition, Mr. Williams' analysis shows that at least 75 individual class members would have paid more in additional

---

[14]    Mr. Williams and his firm have been employed by NFL since 1994, to prepare and file with the Department the company's actuarial memoranda and annual requests for premium rate actions for the Dixie policies. A1288-89, ¶ 2. Ward has never challenged Mr. Williams' expert qualifications.

premiums than they would have received in additional benefits.  A1291, ¶ 8.  Thus, *75 class members have not suffered any injuries or damages at all.*[15]

Mr. Williams' analysis is a proper application of the fundamental economic and legal principle that, in determining the amount of damages to be awarded in a breach of contract action, "the injured party has a right to damages based on his expectation interest as measured by … the loss in value to him of the other party's performance caused by its failure or deficiency, … *less any cost or other loss that he has avoided* by not having to perform."  RESTATEMENT (SECOND) CONTRACTS § 347 (emphasis added); *see also American Capital Corp. v. Federal Deposit Ins. Corp.,* 472 F.3d 859, 867 (Fed. Cir. 2006); *Southern Nuclear Operating Co. v. United States,* 77 Fed. Cl. 396, 434 (2007) ("Damages for the nonbreaching party's reliance on a contract are recoverable *less any loss* that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.") (emphasis added; internal quotation marks omitted).

In other words, in awarding damages based upon defendants' breach, the class members can only be put in as good a position — not a *better* position — as they would have been in if performance had been rendered as promised. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed. Cir.

---

[15]    Assuming that the claims of all Medicare-enrolled class members are properly dismissed from this case, Mr. Williams' analysis shows that class damages must still be reduced by $274,143 based upon the increased premiums the remaining class members would have paid.  A1291, ¶ 9; A1350.

2003) ("[T]he non-breaching party should not be placed in a better position through the award of damages than if there had been no breach."); *Pacific Gas & Elec. Co. v. United States,* 73 Fed. Cl. 333, 378 (2006) (citing cases); 11-55 *Corbin on Contracts* § 55.3. In order to reach such a conclusion, however, "[i]t is necessary for the court to make a further determination as to what costs, if any, the plaintiffs would have incurred in the absence of breach and thus to ascertain the net financial effect of the breach on the plaintiffs." *Bluebonnet,* 39 F.3d at 1346; *see also* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 277, at 284 (2d ed. 2000) (A proper damages analysis "considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position.").

Rather than applying this black letter law, the district court held that such an offset would be "speculative and amount[] to a substantial re-writing of the policy." A1466. There is no record evidence to support the district court's conclusion. Ward never submitted any expert testimony or other evidence to rebut Mr. Williams' opinions or calculations. Moreover, any factual dispute in this respect should have been resolved in NFL's favor.

Additionally, the district court's determination that it would be speculative for any trier of fact to conclude that the Department would have "approved [NFL's] hypothetically requested rate increases" is directly contravened by

defendants' evidence that, over a period of fourteen years, the Department *never denied* any NFL premium increase request for the Dixie policies.  A1289-90, ¶ 4.  Indeed, for the district court to conclude otherwise, as a matter of law, was flatly erroneous.   The Department's consistent approval of NFL's requested rate increases was the *only evidence* on this issue.  Again, the district court improperly construed these facts against NFL, the non-moving party.  That too was reversible error.

Furthermore, the district court erred in rejecting NFL's offset argument merely because it involves purported "hypothetical" considerations such as Department approval of rate increases.  As Professor Corbin explains:

> [I]t is a basic tenet of contract law that the aggrieved party will not be placed in a better position than it would have occupied had the contract been fully performed.... The position that one would have occupied if history had been different is *purely hypothetical*.  *And yet that is the problem that the trial court and jury are required to solve.*  They must determine what additions to the injured party's wealth (expected gains) have been prevented by the breach and what subtractions from his wealth (losses) have been caused by it.

11-55 *Corbin on Contracts* § 55.3 (emphasis added).

Recognizing that Ward and the class would have paid increased premiums in the non-breach world would not, as the district court concluded, amount to a "substantial re-writing of the policy."  A1466.  The policy specifically provides that premiums are adjusted on an annual basis based upon the loss experience from

57

the prior year and, in fact, that is what has historically occurred. Thus, it is the district court that substantially re-wrote the policy's terms and ignored the only relevant evidence before it by finding, as a matter of law, that class members *would not have paid* higher premiums in the non-breach world based upon the increased benefits class members would have received.

In sum, the district court's summary judgment ruling on defendants' damages offset defense is supported by neither the facts nor the law. The court improperly put Ward and the class members in a better position than they would have been in had NFL not breached the contracts. Reversal is warranted because, at a minimum, triable issues of fact exist concerning what additional costs must be deducted from Ward and the class members' damages.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed as a matter of law.

Respectfully submitted,

_____

| | |
|---|---|
| SUSAN E. ENGEL | KENNETH W. STARR |
| ELIZABETH M. LOCKE | KIRKLAND & ELLIS LLP |
| KIRKLAND & ELLIS LLP | 777 South Figueroa Street |
| 655 15th Street, N.W. | Los Angeles, CA 90017 |
| Washington, DC 20005 | (213) 680-8400 |
| (202) 879-5000 | |
| | C. ALLEN FOSTER |
| J. CALHOUN WATSON, JR. | KEVIN E. STERN |
| SOWELL GRAY STEPP | ROBERT P. CHARROW |
| & LAFFITTE, LLC | GREENBERG TRAURIG, LLP |
| 1310 Gadsden Street | 2101 L Street, NW, Suite 1000 |
| Columbia, SC 29211-1550 | Washington, DC 20037 |
| (803) 929-1400 | (202) 331-3100 |

*Attorneys for Defendants-Appellants*

MARCH 2, 2009

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Rule 28.1(e)(2)(A)(i) of the Federal Rules of Appellate Procedure. This brief uses Microsoft Office Word 2003 Times New Roman 14-point typeface and contains 13,793 words exclusive of the corporate disclosure statements, table of contents, table of authorities and the certificate of service.

/s /Kevin E. Stern
Kevin E. Stern

# United States Court of Appeals
# for the Fourth Circuit

*Martha Ward v. Dixie National Life Ins. Co. , et al.,* No. 08-2378

## CERTIFICATE OF SERVICE

I, John C. Kruesi, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by GREENBERG TRAURIG, LLP, Attorneys for Defendants-Appellants to print this document. I am an employee of Counsel Press.

On **March 2, 2009**, Counsel for Appellants has authorized me to electronically file the foregoing **Brief for Defendants-Appellants** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

RICHARD A. HARPOOTLIAN                          TOBIAS G. WARD, JR.
RICHARD A. HARPOOTLIAN, PA          TODD & WARD, PC
1410 Laurel Street                                          1709 Devonshire Drive
P. O. Box 1090                                                Columbia, SC 29204
Columbia, SC 29202-1090                          tgw@thw-law.com
rah@harpootlianlaw.com                            (803) 779-4383
(803) 252-4848

Unless otherwise noted, 8 paper copies have been filed with the Court on the same date via U.S. Express Mail.

March 2, 2009

61